# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

---

**UNITED STATES OF AMERICA,**

          **Plaintiff,**

**v.**                                                                 Case 2:19-cr-20085-JTF

**SHAMARI JOHNSON,**

          **Defendant.**

---

### REPORT AND RECOMMENDATION ON
### DEFENDANT'S MOTION TO SUPPRESS

---

Before the Court is Defendant Shamari Johnson's Motion to Suppress. (Docket Entry ("D.E.") #24). The instant motion has been referred to the United States Magistrate Judge for Report and Recommendation. (D.E. #25). A hearing was held on the motion on October 2, 2019. For the reasons set forth herein, it is RECOMMENDED that Defendant's Motion to Suppress be DENIED.

### I.     Introduction

On April 18, 2019, Defendant was charged in a two-count indictment. Count One charges that, on or about January 28, 2019, Defendant committed identity theft in violation of Title 18,[1] United States Code Sections 1028(a)(7) and 2 and Tennessee Code Annotated Sections 39-14-114 and 39-14-150. Count Two charges that, on or about January 28, 2019, Defendant committed theft of mail in violation of Title 18, United States Code, Section 1708.

---

[1] The Title is not included in the Indictment; however, this offense is found under Title 18 of the United States Code, which codifies federal criminal offenses and criminal procedure.

On August 27, 2019, Defendant filed the instant motion.  Defendant argues that the stop of his vehicle and the ensuing investigatory detention and search of his vehicle were unlawful.  On September 9, 2019, the Government filed its response to Defendant's motion.  The Government asserts that the initial stop of the vehicle and the ensuing investigative detention were justified by reasonable suspicion under *Terry v. Ohio*, 392 U.S. 1 (1968).  The Government further argues that the search of the vehicle was justified by probable cause and by the automobile exception to the Fourth Amendment's warrant requirement.

## II.     Proposed Findings of Fact

On January 28, 2019, the Collierville Police Department ("CPD") received a citizen complaint at approximately 9:59 a.m. of mail theft.  (Hearing Transcript ("Tr.") at 5:16-23, 22:24-23:17, 41:19-24).  The complainant identified himself and provided his address as 1763 Percy Place.  (Tr. at 22:13-14, 23:3-4).  The complainant advised that he had looked out his office window and had seen a black male driving a dark blue four-door Volkswagen with temporary tags removing mail from his mailbox utilizing a rag.  (Tr. at 8:11-9:2, 9:10-24, 22:22-23:17, 25:4-11, 35:4-11, 40:8-20, 42:22-24, 67:12-17).  The complainant further advised that the man was continuing to drive up and down the street removing mail from other neighbors' mailboxes that had the "flags up."  (Tr. at 23:16-17).

The dispatcher relayed this information, and three CPD officers were on patrol in the area—Officer Terry Smith, Officer Ryan Dunn, and Officer Michael Hillin.  (Tr. at 6:11-23, 22:22-24:3, 25:17-22, 67:8-11, 96:18-20).  Officer Smith was approximately one mile away and proceeded towards the complainant's address.  (Tr. at 27:22-28:5, 28:17-18).  Within approximately one to two minutes, Officer Smith arrived at Lonhill, which intersects Percy

Place, and observed a blue four-door Volkswagen with Tennessee temporary tags (the "Vehicle"). (Tr. at 28:6-25). He observed the Vehicle turn off of Percy Place in front of him and noticed that the driver was a black male. (Tr. at 28:6-25, 52:24-53:3). As the Vehicle and general race and sex of the driver matched the descriptions provided via dispatch, Officer Smith activated his blue lights to initiate an investigative stop of the Vehicle. (Tr. at 29:1-4, 53:3-9). The driver of the Vehicle stopped without incident, and Officer Smith went up to him, explained why he was stopped, asked for his driver's license, and instructed him to remain in the Vehicle. (Tr. at 53:8-9, 53:10-14). Defendant provided his identification, and Officer Smith then returned to his patrol car to determine whether Defendant had any outstanding warrants. (Tr. at 53:11-14).

Officer Smith also "got on the radio and asked for one of the cars that was in the area to go speak to the Complainant on Percy Place . . . [to] obtain a little more further information." (Tr. at 29:22-30:1). Officer Smith continued waiting while Officer Dunn and Officer Hillin responded to the Percy Place address to speak to the complainant. (Tr. at 67:20-25, 96:21-97:8). When Officer Dunn and Officer Hillin spoke to the complainant, he reiterated the information he provided to the dispatcher and further advised that the rag being used by the man who was driving the Vehicle was white—a detail that he had not already provided. (Tr. at 40:17-20, 68:8-18, 97:11-16).

Officer Dunn departed from the Percy Place address first, leaving Officer Hillin to finish speaking with the complainant. (Tr. at 68:19-20). Officer Dunn proceeded to the location of the stop, which was "right around the corner," while Officer Hillin went to other neighbors' homes and attempted to speak with the homeowners (Tr. at 68:19-22, 99:4-17, 100:18-101:10);

3

however, Officer Hillin was unable to make contact with anyone and only spent about twenty to thirty seconds at each residence (Tr. at 101:7-10).

Officer Hillin proceeded to the location of the stop soon after. (Tr. at 97:17-25). When he arrived, Officer Smith was standing at the Vehicle while Defendant was sitting inside it. (Tr. at 69:3-8, 71:19-72:2). Defendant was not free to leave at this time because the officers were still investigating the mail theft. (Tr. at 58:12-16). Officer Hillin spoke to Officer Dunn and Officer Smith "to make sure they knew what all the Complainant had said." (Tr. at 98:1-4).

Officer Smith ordered Defendant to step outside of his Vehicle "away from his passenger compartment," and Defendant complied. (Tr. at 69:11-16, 78:4-6). Officer Hillin and Officer Dunn "walked up on the passenger side of the vehicle" and "walked around the car just to look to see if there's any mail visible from the outside." (Tr. at 69:18-19, 98:6-9). Officer Dunn "immediately saw a white rag in the floorboard of the driver's seat . . . [with] about three quarters of the rag . . . sticking out from under the seat." (Tr. at 69:17-24, 98:6-9).

Officer Smith stood with Defendant behind the Vehicle while Officers Dunn and Hillin searched it. (Tr. at 31:15-22, 58:5-11, 69:25-70:2, 78:7-79:1). Defendant was no longer within arm's reach of his Vehicle when the search took place. (Tr. at 59:11-14, 80:14-17). Officers Dunn and Hillin located "a whole lot of mail" in the "cubby hole in the roof." (Tr. at 47:22-25, 70:3-6, 98:11-13). Officer Dunn advised Officer Smith that Defendant had "large amounts of mail in there from that neighborhood." (Tr. at 70:20). Officer Smith then placed Defendant in handcuffs and into his patrol car at approximately 10:13 a.m. (Tr. at 46:23-47:13, 57:2-7, 58:5-11, 70:22-23, 72:22-73:1, 73:13-15, 75:8-11, 80:18-21, 103:20-23). Ultimately, he received a

misdemeanor citation for mailbox tampering in violation of Tennessee Code Annotated Section 39-14-412. (Tr. at 32:13, 52:5-23).

### III. Proposed Analysis

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. The Fourth Amendment applies to government intrusions where the person has a reasonable expectation of privacy. *Soldal v. Cook County, Illinois*, 506. U.S. 56, 69 (1992); *Rakas v. Illinois*, 439 U.S. 128, 148-49 (1978). When the protections of the Fourth Amendment apply, a warrant is generally required unless an exception to the warrant requirement justifies the intrusion. *United States v. Garcia*, 496 F.3d 495, 508 (6th Cir. 2007) (citing *United States v. McLevain*, 310 F.3d 434, 438 (6th Cir. 2002)).

In determining whether the Fourth Amendment's protections are implicated, the Court must look to the nature of the encounter between law enforcement and the individual. *United States v. Waldon*, 206 F.3d 597, 602 (6th Cir. 2000) (quoting *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997) (internal citations omitted)). There are three types of permissible encounters between the police and citizens: "(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause." *Id*.

During a consensual encounter, "law enforcement officers may approach an individual and ask general questions without having any reasonable suspicion of criminal activity, so long as the officers refrain from the type of intimidating behavior that would lead a reasonable person

to believe that the person was not free to leave." *Waldon*, 206 F.3d at 603. "Whether an encounter between a police officer and a citizen is consensual depends on the officer's objective behavior, not any subjective suspicion of criminal activity." *Id.* A consensual encounter does not implicate the Fourth Amendment's protections, as it does not constitute a "seizure" or "search" to "approach[] an individual and ask a few questions." *Florida v. Bostick*, 501 U.S. 434, 434 (1991).

An encounter escalates to a seizure and implicates the Fourth Amendment "when a reasonable person, in view of the circumstances surrounding the encounter with law enforcement officials, believes he is not free to leave." *United States v. Winfrey*, 915 F.2d 212, 216 (6th Cir. 1990) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). A request that the person stay at the location or a request for and retention of the person's property has been held to implicate the Fourth Amendment. *Winfrey*, 915 F.2d at 216; *see also Florida v. Royer*, 460 U.S. 491, 501-502 (1983).

"A temporary seizure under the Fourth Amendment may be justifiable if a reasonable articulable suspicion of criminal activity actually exists." *Winfrey*, 915 F.2d at 216 (quoting *Terry v. Ohio*, 392 U.S. 1, 16-19 (1968)). Such an investigative detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Winfrey*, 915 F.2d at 216 (quoting *Florida v. Royer*, 460 U.S. 491, 497 (1983)). Similarly, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.* The reasonableness of an investigation, then, is a dual inquiry: (1) whether the officers' conduct is supported by articulable suspicion; and, (2)

whether the detention and investigative methods used were reasonable under the circumstances. *Winfrey*, 915 F.2d at 216 (citing cases).

An arrest must be supported by probable cause, which must be determined under the totality-of-the-circumstances approach. *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983). There is no bright-line test for determining when an arrest occurs. *United States v. Lopez-Arias*, 344 F.3d 623, 627-28 (6th Cir. 2003). The analysis of the conditions and circumstances that rise to the level of arrest is a fact-sensitive inquiry. *Id.* In making this determination, a court shall consider a variety of factors, including, but not limited to: (1) movement or transportation of the detainee from the site of the initial stop or detention to another location; (2) the nature and extent of the imposition of restraint or limitation on freedom of movement involving physical confinement or other coercion; (3) use of weapons or bodily force; and (4) issuance of *Miranda* warnings. *Id.* However, no single factor is ultimately dispositive of this issue, and the court must look toward the whole of the events in question. *Id*.

Defendant first asserts that there was no proper basis for the stop. Upon review, the complainant initially provided certain key information to CPD regarding the suspect. He provided his own name and address, a description of the suspect (black male), a description of the Vehicle (dark blue, four-door Volkswagen with a temporary tag), and an additional detail pertaining to the offense (use of a rag). Officer Smith proceeded to the neighborhood, arrived within one to two minutes, and observed a black male driving a car that exactly matched the description of the Vehicle located just around the corner from the complainant's address.

In *United States v. Babb*, 77 Fed. Appx. 761 (6th Cir. 2003), the Sixth Circuit concluded that officers had reasonable suspicion under highly similar facts: the vehicle matched the make,

model, and color; the driver matched the physical description provided; and, the vehicle was "traveling the route expected." *Id*. at 766; *see also United States v. Bernard Avery, Jr.*, No. 07-20040, 2010 WL 419946, at *3 (W.D. Tenn. Jan. 28, 2010) (holding that "[o]fficers clearly had reasonable suspicion sufficient to justify an investigative stop" of a van because it "matched [a] BOLO description in every detail" and it was "spotted cruising in the same area where" the robbery that prompted the BOLO report had occurred).

Under circumstances such as those in *Babb* and *Avery*, the Supreme Court has reasoned as follows:

> The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, [*Terry*] recognizes that it may be the essence of good police work to adopt an intermediate response. A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

*Adams v. Williams*, 407 U.S. 143, 146 (citing *Terry*, 392 U.S. at 21-22). Here, it is RECOMMENDED that Officer Smith lawfully stopped Defendant for precisely these reasons.

Despite the detailed information provided to law enforcement coupled with Officer Smith's observations, Defendant asserts that officers had no way to know that the complainant was sufficiently truthful and reliable to establish reasonable suspicion. In *Adams*, 407 U.S. 143 (1972), the United States Supreme Court rejected the theory that reasonable suspicion "can only be based on the officer's personal observation"; instead, the *Adams* court considered the reliability of an informant and found two factors to be pertinent. *Id*. at 146. First, "[t]he informant here came forward personally to give information that was immediately verifiable at the scene." *Id*. at 146; *see also Navarette v. California*, 572 U.S. 393, 396 (2014) (recognizing

that "the caller necessarily claimed eyewitness knowledge"); *Robinson v. Howes*, 663 F.3d 819, 829 (6th Cir. 2012) (reasoning that "[f]irsthand knowledge and contemporaneity," including over the phone, "weigh in favor of a statement's reliability").

Second, "the informant might have been subject to immediate arrest for making a false complaint" had the investigation proved that the tip was lacking in veracity. *Id*.; *see also United States v. Miller*, 314 F.3d 265 (6th Cir. 2002) (reasoning that the complainant "was not an anonymous tipster and will not be treated as such" and that, with his "identity secured," he "was subject to prosecution if this information was fabricated").

In addition to the factors considered in *Adams*, the *Navarette* Court opined that it is also significant that the eyewitness's report pertains to "an ongoing crime" rather than "an isolated episode of past recklessness." 572 U.S. at 401.  Here, the offense was also reported to be ongoing, as the complainant advised that he saw the individual continuing to drive down the street opening mailboxes.  Accordingly, based upon the corroboration of the information provided and upon the complainant's reliability, it is RECOMMENDED that Officer Smith had reasonable suspicion at this point to initiate an investigative detention under *Terry*.

Next, Defendant briefly states that the degree of intrusion of the investigative detention was "unconstitutional and unwarranted."  Here, the investigative detention lasted approximately ten minutes, during which time Officer Smith paused and allowed Officers Dunn and Hillin to obtain further information to confirm or dispel their suspicions.  Although "[a]n investigative *Terry* stop may ripen into a *de facto* arrest through the passage of time," *Weaver v. Shadoan*, 340 F.3d 398, 408 (6th Cir. 2003), there is "'no rigid time limitation for determining the lawfulness of a *Terry* stop," *Smith v. Township of Prairieville*, 194 F. Supp. 3d 658, 668 (W.D. Mich. 2016).

In *United States v. Sharpe*, 470 U.S. 675 (1985), the United States Supreme Court upheld a twenty-minute detention when the police officers acted diligently and did not unnecessarily prolong the investigation. *Id*. at 686-87. The Sixth Circuit and the District Courts within it have also routinely upheld investigative detentions of approximately ten minutes. *Weaver*, 340 F.3d at 408 (upholding an investigative detention lasting between four and fifteen minutes); *United States v. Wellman*, 185 F.3d 651, 656-57 (6th Cir. 1999) (concluding that a fifteen-to-twenty minute detention was lawful); *United States v. Winfrey*, 915 F.2d 212, 217 (6th Cir. 1990) (reasoning that a ten-to-fifteen minute delay did not elevate a *Terry* stop into an arrest).

Not only was the ten-minute duration within reasonable bounds, but the actions taken within that time frame were also reasonable. Specifically, the CPD officers took measured but expeditious steps to investigate whether Defendant was the individual removing mail from the mailboxes. Officer Smith allowed Defendant to remain seated in his Vehicle for the short period of time that it took for his partners to follow up with the complainant in person. Officers Dunn and Hillin were also expeditious in speaking with the complainant and reasonable in making observations from the exterior of the Vehicle before proceeding further. Accordingly, it is RECOMMENDED that the scope of this investigative detention under *Terry* was temporary and lasted no longer than necessary to effectuate the purpose of the stop. As such, it is RECOMMENDED that the investigatory detention was lawful.

Defendant then argues that the search of his vehicle was unlawful because no genuine safety or evidentiary concerns existed. The Government asserts that the automobile exception to the Fourth Amendment's warrant requirement permits the search. Under that exception, an officer may search a vehicle without a warrant if he has probable cause to believe that the vehicle

contains evidence of a crime. *United States v. Johnson*, 707 F.3d 655, 658 (6th Cir. 2013) (citation omitted). Probable cause exists when there is a fair probability that contraband or evidence of a crime will be found in a particular place, and it "may come from an informant's tip, when sufficiently detailed and corroborated by the independent investigation of law enforcement officers." *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998) (citations omitted). The scope of a warrantless automobile search under this exception is no broader, and no narrower, than a search authorized by a warrant. *United States v. Ross*, 456 U.S. 798, 824 (1982). "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of a search." *Id*. The automobile exception "does not have a separate exigency requirement." *Maryland v. Dyson*, 527 U.S. 465, 467 (1999).

Here, the complainant advised that the individual was removing mail from his and others' mailboxes. Officer Smith detained Defendant within one to two minutes later. Given the short time frame between the complainant's call and Officer Smith's arrival, there was a fair probability that the stolen mail would be located in the vehicle. Moreover, officers had already observed the white rag reported to be used in committing the offense, which was itself evidence that provided probable cause for the search of the vehicle. Thus, it is RECOMMENDED that the automobile exception to the warrant requirement applies and Defendant's Fourth Amendment rights were not violated by the search of his vehicle.[2]

---

[2] Defendant additionally asserts that "the indirect fruits of an illegal search should be suppressed when they bear sufficiently close relationship to the underlying illegality"; however, as it is RECOMMENDED that there was no illegality here, it is further RECOMMENDED that there is no fruit of the poisonous tree under *Wong Sun v. United States*, 371 U.S. 471 (1963), that should be suppressed.

## IV.     Conclusion

For the reasons set forth herein, it is RECOMMENDED that Defendant's Motion to Suppress be DENIED.

Signed this 5th day of December, 2019.

                                                        s/ Charmiane G. Claxton
                                                       CHARMIANE G. CLAXTON
                                                       UNITED STATES MAGISTRATE JUDGE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**